## Anna L. McCulloch et al. v. W. W. Stone, Auditor.

1. **Mandamus.** *Tax-title sought. Power of auditor to determine validity of. Action, by whom to be brought*

An action of mandamus will lie to compel the auditor to convey to any one offering to comply with the requirements of law on this subject such title as the State may have to lands acquired under a tax-sale, whether such sale, in the opinion of the auditor, be valid or not. The auditor has no authority to determine as a matter of law the validity of a tax-sale, except that he may, with the advice of the attorney general, strike from his lists such lands as in the opinion of the attorney general are held by the State by invalid titles. And such action is maintainable by the party seeking the conveyance of the auditor.

2. **Same.** *Tax-title. Previous conveyance by auditor. Scope of adjudication.*

And if to such action of mandamus the auditor set up the defense that he has already conveyed the title of the State to the lands in question to another, this court will determine whether such conveyance be a valid one, but will not pass upon the validity of the title under which the State held.

3. **Auditor's Deed.** *Conveyance by auditor of lands of State without collecting taxes due thereon. Effect of. Act of March 14, 1884, construed.*

Under an act approved March 14, 1884, entitled "An Act for the benefit of purchasers of levee lands sold under the decree of the Chancery Court of Hinds County, First District, in case of Joshua Green and others against Hemingway and Gibbs, treasurer and auditor, and *ex officio* liquidating levee commissioners," if the auditor, by mistake of law, treat certain lands included in this act as exempt from taxation, when in fact such lands were not exempt, and thereby fails to demand and collect certain taxes due thereon as required by the act above referred to before executing a quit-claim deed thereto, as provided in that act, then such conveyance is void and of no effect.

4. **Railroad Company.** *Exemption from taxation. Outlying lands. Charter of M. & V. R. R. construed.*

Under a charter of the M. & V. R. R. Co., which exempts it from all taxes "to which said company shall be subject," taxes on outlying lands not used in the construction, operation, or physical maintenance of the road are not included in such provision.

5. **Constitutional Law.** *Legislative construction of charter. Act of March 12, 1884. Exemption from taxation. Judicial functions.*

By an act passed March 12, 1884, Acts of 1884, p. 29, the legislature, while declaring that all detached lands of railroads should be liable to taxation notwithstanding any charter provision to the contrary, further declared "that the provisions of this act shall not have the effect to tax any of the lands of

the M. & V. R. R. Co. until February 1, 1886." *Held*, that if the above act be construed as exempting by its terms the lands of such company from taxation, then it could only refer to taxation arising after its passage; if it be a construction merely of the meaning of the charter of such company, then it is unconstitutional and without effect, as assuming to perform a judicial function.

Appeal from the Circuit Court of Hinds County.

Hon. T. J. Wharton, Judge.

The case is sufficiently stated in the opinion of the court.

*Calvin Perkins*, for the appellant.

1. The sale to the levee commissioners in May, 1872, was void, because the land was at the time on the State's delinquent lists, held there under the sale of 1862, and ten years of valid State and county taxes had accrued against it while so held, notwithstanding that such sale was ineffectual to pass title to the State, because " war taxes" were charged against the land at the sale along with other valid taxes. For ten years the tax collectors in their settlements with the auditor had been allowed a credit for this land, as the property of the State not subject to sale, and on which they had no power to receive the taxes.

2. Has the railroad acquired the State's claim under the conveyance executed by the auditor?

The act of 1884 (page 182) made the auditor the person to execute the conveyance, because the records of his office show the exact status of every piece of land in the State, so far as taxes are concerned. A mere inspection of those records would show whether there were any, and what liquidating levee taxes unpaid, the same as to No. 1 levee taxes, and the same as to State and county taxes. And it directed him not to execute any such quit-claim " unless all State, county, and levee taxes shall have been paid." It was a mere clerical, a ministerial act, for the auditor to look at his record books (and not to any matter *in pais*), and determine whether or not there were any unpaid taxes upon the land in question. If he found that there were, then it was his duty to desist. That land did not belong to the class of lands which he was authorized to quit-claim, and would not, until all State and levee taxes shall have been

paid. Paid how? Not to the auditor under that act, for nowhere does the act say that the auditor shall under its provisions and terms collect the taxes, but it leaves the same to be paid as the law then in existence, or which might thereafter be enacted, should require.

But it is said that the *proviso,* wherein mention is made of the Memphis and Vicksburg Railroad, discloses an intention that the auditor should collect taxes under that act, according to its terms. Not so. According to the railroad charter, the company had a virtual exemption as to its *current* taxes by presenting a proper affidavit to the tax collector, and the failure to present that affidavit within the time required to pay taxes would subject the property to sale, just as the failure of an individual would subject his to sale. Now as to the taxes from 1875 to 1881 inclusive, there can be no pretense that the railroad charter had any application, as the land was not purchased by the railroad company until 1881.

But the exemption claimed in the railroad charter itself is null and void, such discrimination in favor of one particular individual or corporation being prohibited by §§ 5 and 20, article xii, of the constitution. *Miss. Mills* v. *Cook,* 56 Miss. 40.

It was permissible to exempt in that manner all property invested in railroad enterprises or to exempt all lands, but certainly not to exempt the lands of certain particular railroads and no other, and that, too, when they are not used for railroad purposes. The original § 21 of the charter of the Mobile and North-western Railroad will not fairly bear the construction that it covers any but property used for railroad purposes, but subsequent legislatures have passed acts by way of "legislative construction" which now give color to the claim that the exemption covers all property owned by the railroad corporation, no matter for what purpose it is used or held. The framers of the constitution builded wisely when they prohibited the legislature from making any such odious discriminations in exercising the taxing power.

3. Can the validity of the patent, executed by the auditor, be questioned in this proceeding?

In *Jackson* v. *Dilworth,* 39 Miss. 773, it was established that the execution of a void patent by the secretary of State was no bar to

a mandamus proceeding to compel him to issue a second one upon proper application. This case was cited and approved in *Clement* v. *Anderson*, 46 Miss. 601, and the same doctrine is announced in *Myers* v. *State*, 61 Miss. 138.

Patents were collaterally impeached in *Stoddard* v. *Chambers*, 2 How. (U. S.) 284 ; 7 S. & M. 363 and 366 ; 4 S. & M. 40 to 49 ; *Graham* v. *Smith*, 1 Humph. 546 ; *Rainey* v. *Aydelette*, 4 Heisk. 123.

The two last cases were mandamus cases and second patents were awarded, notwithstanding the issuance of prior void ones.

*Calvin Perkins*, for the appellant, argued the case orally.

*T. M. Miller*, Attorney General, for the appellee.

If the lands were properly sold for the tax of five cents per acre, commonly called the liquidating levee tax, then petitioner is without any case, for by the very terms of the act of 1867 (constituting an irrepealable contract between the State and the holders of bonds issued under that act) the lands were made exempt from all other taxes—hence sales—until redeemed or purchased, so that title could not have been acquired by the State under the alleged sale in May, 1875. *Green* v. *Gibbs & Hemingway*, 54 Miss. 593; *Mayer* v. *Peebles*, 58 Miss. 628.

Now, the only ground upon which the sale to the liquidating levee commissioners is assailed was the non-liability of the lands to the tax in view of the previous sale to the State (1862). But the sale in 1862 was absolutely void for the reason that a part of the State tax for the fiscal year 1861 was levied in aid of the Rebellion. All acts of the State government in furtherance of the war then being prosecuted against the Government of the United States were nullities. *Shattuck* v. *Daniels*, 52 Miss. 834.

If the sale of 1862 was *void*, it is shocking to common sense to say that the lands conveyed under it were *held by the State*, and, therefore, exempt from the levee tax.

Assuming for the present that it may be made the subject of inquiry at the instance of any person desiring to purchase the lands, was the alleged act of the auditor (Gwin) in quit-claiming the State's title to the railroad company void because he (for the

State) received no consideration?    The judgment of the lower court does not depend upon an affirmative answer by this court, still, on account of the magnitude of interests involved to hundreds of persons, who have purchased lands from the company and from others on the idea that all the tax-titles had been quieted, it is hoped the question will be considered as presented and settled once for all, and especially since no limitation runs against the State.

The act of 1884 provided imperatively in the first section that the auditor should make to all purchasers of land under the chancery decree quit-claim deeds conveying to them any title the State might have to the same upon payment of all levee taxes.

Section 2 provided that such quit-claim deed should not be made unless all State, county, and levee taxes due on the land should have been paid, with a proviso that the auditor should not require the Memphis and Vicksburg Railroad Company to pay any State and county taxes therefor due from which it was exempted by the terms of its charter or any act of the legislature passed prior to 1884.

What was the duty of the auditor, when the company made application for the quit-claim deed under that act?    First, he was required to ascertain what, if any, taxes were due upon the land.    If none were found to be due (and his judgment was conclusive so far as this proceeding is concerned), then it was his duty to make the deed.    If levee taxes were due, the State would not be concerned with his failure to collect them.    If State and county taxes were found to be due, then his next inquiry would be whether or not the lands in the hands of the railroad company were exempt from taxation.

By the act of making the deed without collecting any taxes, the auditor adjudged either that no taxes were due upon the lands, or that they were lands of the railroad company exempted by its charter.    It must be presumed that he found the taxes had been paid, upon proper evidence.    They were payable, if at all, to the tax collector of the county.

I leave the matter of the exemption to be presented by the

counsel for the company, who, in the interest of justice and fair dealing, have been allowed to take part in the argument of this case.

I think no authority need be here cited that mandamus will not lie to review the exercise of judicial or even *quasi* judicial power, such as was vested in the then auditor of public accounts by the act of 1884.

The Attorney General also made an oral argument.

*Nugent & McWillie,* on the same side.

1. The first objection to the petition is that the petitioners do not show a clear and specific legal right to the relief claimed. Their titles all rest upon a tax-sale to the State made in 1862 for the taxes of 1861. A large part of these taxes was for war purposes and, therefore, illegal, and the sale, being for taxes in part illegal, is of no validity whatever. *Dogan* v. *Griffin,* 51 Miss. 784; *Shattuck* v. *Daniel,* 52 Miss. 836; *Gamble* v. *Witty,* 55 Miss. 37; *Smith* v. *Nelson,* 57 Miss. 138; *Mayer* v. *Peebles,* 58 Miss. 628.

2. The question now sought to be reopened is *res judicata.* The suit of Joshua Green, holder of liquidative land bonds, was brought in 1877 to enforce a trust in the lands held by the liquidative levee board, or formerly held by it, and to which the State asserted title under the abatement act or otherwise. 54 Miss. 593, 600. The very object of this suit was to discover the lands held and claimed by the State, and which rightfully constituted under the levee laws a trust fund for the payment of the levee bonds issued under the act of 1867, and to get rid of the State's claim said to be a cloud. The bill to which the State was a party prayed an adjudication of this trust, and there was, accordingly, a decree under which the lands in controversy were disposed of. The officers of the State were respondents, and made the discovery prayed. How, now, can the question be reopened? The State was a party to the suit, her auditor represented the levee board, and her attorney general represented him. The direct question as to who held the land was involved in the controversy, and was necessarily adjudicated. *Agnew* v. *McElroy,* 10 S. & M. 552; *Shattuck* v. *Milton,* 50 Miss. 391; *Land* v. *Keirn,* 52 Miss. 341; *Stewart* v. *Stebbins,* 30 Miss. 66.

3. But the State has parted with her title under the "Act for the benefit of purchasers of levee lands sold under the decree of Chancery Court of Hinds County, first district, in case of Joshua Green and others against Hemingway and Gibbs, auditor and treasurer, and *ex-officio* liquidating levee commissioner," approved March 14, 1884.. The first section of this act is mandatory. The second section provides that the quit-claim of the State shall not be executed unless all State, county, and levee taxes due thereon (on the lands) up to the date of the execution of the quit-claim as aforesaid shall have been paid. This section is coupled with a proviso that the Memphis and Vicksburg Railroad Company shall not be required to pay any State and county taxes theretofore due from which it was exempt under the statutes of the State.

There can be no difficulty in understanding this law. The land referred to had been administered by the Chancery Court of Hinds County as a trust and sold as such in a proceeding to which the State was a party. The legislature recognized the equity and propriety of the proceeding, so far as the purchasers were concerned, in view of the beneficial results following the disposition of the lands, and knew or supposed that all these lands had been struck off to the State under the abatement laws, and wrongfully or rightfully sold. It was known that, if the land when sold to the levee board was held by the State, no title passed, and *vice versa*, and, in view of the loose manner in which tax-sales had been conducted, that great difficulty would be experienced in adjusting these conflicting tax-titles and purchases by those desirous of occupying the lands purchased.

It was readily discovered that the continued existence of this color of title in the State would embarrass the purchasers under the decree of the said chancery court, and hence the law for their benefit was passed. When they could show that all State and county taxes due upon these lands, from and after the day of their sale in that case, were paid, the words are, "shall have been paid" —the auditor was to give them a quit-claim deed and thus complete their titles. It should not be supposed that the legislature intended in any way to undo what the chancery court had done

in a direct proceeding against the State, and that, too, for the purpose of administering a trust. On the contrary, the idea was to promote and effectuate what had been done, and fortify the titles derived by the purchasers under the decree, by passing to them whatever of title the State had acquired under the abatement act or otherwise.

*W. A. Percy,* on the same side.

1. Counsel for appellants seems to think that although the sales of 1862 were utterly void, yet in some mystical way, and because the State had some sort of a claim on the land for taxes, she held the land under them, sufficiently at least to bar any future sale for levee taxes.

*Mayer* v. *Peebles,* 58 Miss. 628, decided by this court, holds that if land is held by the liquidating levee board under a valid sale, it is exempt from future sales for State and county taxes, but that if the sale to the levee board was for any reason void then the subsequent sale for State and county taxes would be valid. This case is a complete answer to appellants' position, if it needed further answer. The language of the levee act is that all land held by the board shall be exempt from State and county taxes. In this case a deed had been executed to the board, which was held void because the sale appeared to have been made on the wrong day. This court decided that the land was not held by the board, and that it was, therefore, subject to future sale for State and county taxes. It may be said that the deed showed on its face that it was void. But equally did a deed for the State and county taxes of 1861 show on its face that it was void. The two cases are exactly on all fours. No conceivable reason can be given why a different rule should be applied in instances where the void sale was made in the first instance to the State. In the one instance, land is exempt from sale if held by the levee board; in the other, it is exempt if held by the State. It is not exempt if held or claimed by the board under a void sale. It certainly cannot be exempt if held or claimed by the State under a void sale.

2. The State's title, whatever that was, as it existed in 1884, had been already legally conveyed by the auditor to the railway com-

pany when appellants applied to him and he could not lawfully make another conveyance. 31 Ark. 425. The legislative purpose in passing the act of 1884 is entirely clear. Under the decree in *Green* v. *Gibbs*, about one million five hundred thousand acres of land, which had hitherto and for twenty years laid like an incubus upon the non-taxpaying lists, paying no revenue and producing nothing in itself, was sold to syndicates, corporations, and individuals. This same land, under a mistaken view of the law, had been sold in 1875 and years following to the State. This court had declared in *Green* v. *Gibbs* that such sales to the State of lands held by the levee board were unconstitutional and void. Still the lands were listed on the State rolls as State lands. A cloud upon the title derived under the chancery court decree was thus created which would operate to retard and prevent the settlement of these lands. Wisely, the legislature determined to remove as much as possible all doubt as to the title, and directed the conveyance of the State's title, already declared void, to the purchasers of the levee title. Hence the act of 1884.

I submit, then, that the conveyance by the auditor divested whatever title the State might have and vested it in the railway company. That it is a matter which concerns only the State and her official, and of which no third party can avail himself, and that if there was any failure to collect the true amount of tax the remedy of the State is against the auditor, or possibly the purchaser. Even then if the title acquired through the levee board were utterly invalid, the State's deed of 1884 would present an insuperable barrier to appellants' petition.

The reason given by appellants why the auditor's deed of 1884 was a nullity is that in obtaining the deed no money at all was paid, except the fees of the auditor and treasurer, and that the taxes for which the land had been sold in 1875, 1876, and 1877, and accrued taxes for subsequent years, remained unpaid. Their allegation that any taxes were due is based upon the idea that the sales of 1875, 1876, and 1877 were valid, and the levee sales of 1868 and 1872 void. This has already been shown to be untrue. The plain meaning to be derived from the allegation is that the

railway company in obtaining the deeds of 1884 failed to pay to the auditor State, county, and levee taxes with which the land stood chargeable on his books for tax-sales of 1875, 1876, and 1877, and years subsequent thereto. Those sales being void in point of fact, the land was not chargeable with any taxes on account of them.

The language of the act of 1884 is that the "auditor shall not execute said deeds unless all taxes have been paid." It does not contemplate payment to the auditor alone. On the contrary, an individual who had purchased from the commissioners of the Hinds County Chancery Court in 1881, would most probably have paid subsequently accruing taxes to the collector of his county as they became due. When he applied to the auditor for his deed, under the act of 1884, and satisfied him that prior taxes had been paid, there would be nothing to pay the auditor, except his fees and cost of conveyance.. So that it only appears clearly from the petition that no taxes were paid the auditor. It does not clearly appear that none were paid otherwise.

But the act of 1884 contains this further clause, to wit : "*Provided*, That the Memphis and Vicksburg Railroad Company shall not be required to pay any State and county taxes heretofore due from which it was exempted by its charter, or any act prior to 1884."

No State and county taxes could have been properly collected on this land, because of the charter provisions of the railway company. Those provisions are found in Acts of 1870, pp. 268, 327, and Acts of 1882, p. 1011. By them the twenty-first section of the charter of the Mobile and Northwestern Railroad Company is made a part of the charter of the Memphis and Vicksburg Railroad Company in 1870, and in 1882 it is made a part of the charter of the company to be formed by the consolidation of the Memphis and Vicksburg Railroad Company with other companies, which company so formed is the L., N. O. & T. Ry. Co.

Said twenty-first section provides in substance that all taxes to which said company shall become subject shall be appropriated to its debts, or for money borrowed on *its lands*, and upon affidavit

made to that effect, presented to the collector, he shall give receipts, which shall be in full of all taxes to which said company shall be subject. This to be in force for twenty-five years from 1882, unless the company shall earn a certain dividend sooner. It is not necessary to discuss the question now as to whether this is an exemption strictly or a contract appropriating certain taxes. For the purposes of this discussion, I will treat it as in the nature of an exemption. Does this provision, or rather did it in 1884, when the auditor made his deed to railway company, apply to detached lands of the company?

The general principle that exemption laws, incorporated in railroad charters, do not apply to detached lands held by the company is fully conceded. But the further principle, and that the controlling one, is that the extent of the application of such laws and what particular property is covered by them is to be determined solely by the legislative intent to be gathered from the particular statute.

If it is broad enough in its terms to apply to detached land, such application is within legislative power, and the courts must give the just force and effect to the language which its import demands. *Tennessee* v. *Whitworth*, 117 U. S. S. C. Rep. 149 ; *M. & O. R. R. Co.* v. *Mosely*, 52 Miss. 127; Cooley on Taxation, p. 151, and notes.

The language used in said twenty-first section is "all taxes to which said company shall be subject shall be appropriated to its debts or for money borrowed *on lands.*" The contemplation was that the company would own lands and would borrow money on its lands. It would be subject to taxes as much on account of its land as on account of its road-bed. It manifestly could not have been the legislative intent to appropriate the taxes to fall due on the railroad itself to payment of money borrowed on its lands, and at the same time to have required the payment of taxes falling due on those very lands into the State treasury. Such a construction would be strained, incongruous, and in violation of the plain legislative intent. The charter of the company contemplates that it shall hold detached lands, that it shall receive donations of land,

that it may accept land in payment of stock subscriptions, that it may purchase, sell, lease, and rent land.    Acts 1870, p. 316 ; §§ 1 and 16 of M. & V. R. R. Co.'s charter.

*W. A. Percy* also argued the case orally.

Cooper, C. J., delivered the opinion of the court.

This is a petition for a mandamus against the auditor of the State, to require him to make to the petitioners a conveyance of the State's title to certain lands.    To the petition the auditor interposed a demurrer, which was sustained in the lower court, and from that judgment this appeal is prosecuted.

In the petition the following history of the title is given : In 1862 the lands were sold for the taxes of 1861 (including a military tax levied for the support of the armies of the Confederate States), and were bought by the State.    In the years 1868 and 1872 the lands were sold for the non-payment of liquidating levee taxes and bought by the levee board.    In 1875 they were again sold by the sheriff and tax collector under the act of March, 1875, commonly known as the Abatement Act, and again bought by the State.    In 1881 they were sold under the decree of the Chancery Court of Hinds County, made in the case of *Green* v. *Gibbs et al.*, which will be found reported in 54 Miss. 593, and were purchased by the Louisville, New Orleans and Texas Railroad Company.    On September 30, 1884, the auditor, acting under an act of the legislature approved March 14, 1884, the provisions of which will be hereinafter set forth, executed and delivered to the said company a quit-claim deed, conveying the State's interest therein.    Afterward the appellants tendered to the auditor the sum which appeared on the books of his office to have been due the State on account of the taxes thereon, and demanded a deed, which he refused to make, giving, as the petition states, " no other reason than that the State had no title or claim to the land because of execution of the pretended release and quit-claim of September 30, 1884."    By the demurrer, however, the auditor sets up the further objection that the State never had any valid title to the land or any part thereof.    In support of the defense thus interposed

by the demurrer for the first time, it is argued that the first sale to the State was void, for the reason that a part of the tax for which it was made was in "aid of the Rebellion;" that as the sale was void, the land was legally sold to the liquidating levee board, which acquired a good title thereto, and that after it became the property of the levee board it was exempt from sale for taxes due the State, wherefore the sale in 1875 was also a nullity. We dispose of this question by saying that it is not within the province of the auditor to determine upon the validity of a tax-title acquired by the State. The validity or invalidity of a tax-title can only be determined by the courts, except where, upon the advice of the attorney general, the auditor is permitted to strike from his list of lands those which in the opinion of the law officer of the State are not held by a valid title; nor will the court, upon a mandamus, inquire into or determine the validity of such titles.

Where a mandamus is sought to compel the execution of a conveyance, and the objection is made that the State has no title, because it has already parted with it, it becomes necessary to decide the question, for only by such decision can we determine whether the officer ought to act. *State* v. *Myers*, 61 Miss. 138. But the validity or invalidity of the original title claimed by the State ought not to be drawn in question collaterally, and it is only collaterally involved in this suit.

Whatever, then, is the character of the State's title acquired under the sale for taxes, the petitioners are entitled to have it conveyed to them upon the payment of the sum claimed against it by the State, unless there has been an authorized transfer of it by the State's officers competent to convey her title. The real ground of the refusal by the auditor to convey to the petitioners is that by the deed of September 30, 1884, the State had parted with all claim to the land. If this be true the auditor properly refused to make another conveyance.

The authority of the auditor to make the conveyance of September 30, 1884, is derived from an act entitled: "An Act for the benefit of purchasers of levee lands, sold under the decree of the Chancery Court of Hinds County, First District, in case of

Joshua Green and others against Hemingway and Gibbs, treasurer and auditor, and *ex-officio* liquidating levee commissioners," approved March 14, 1884 (Acts, page 182).

By the first section of that act, the auditor is directed to quit-claim the title of the State to the purchasers under the decree recited in it upon the payment of the usual fees for making such conveyances. To this section there is a proviso in reference to the payment of levee taxes, but which is unimportant now to state. The second section of the Act is as follows :

Section 2. "Be it further enacted, that said auditor of public accounts shall not in any case execute such quit-claim deed described in the foregoing section, unless all State, county, and levee taxes due thereon, up to the date of the execution of the quit-claim deed as aforesaid, shall have been paid; provided, that the Memphis and Vicksburg Railroad Company shall not be required by the auditor to pay any State and county taxes heretofore due from which it was exempted by the provisions of its charter, or of any act of the legislature passed prior to the year 1884."

The appellee contends that by this act the legislature committed to him the determination of what, if any, taxes were due on the lands referred to, and that his decision is final and conclusive, or, if mistaken in this, that the State alone can call in question the correctness of his decision, and if mistaken in both these propositions, then he insists that as a matter of fact no taxes were due by reason of the fact that the property of the railroad company was by its charter exempt from taxation.

Without determining what effect would be given to the decision of the auditor upon questions of fact necessarily involved in the performance of the duty devolved upon him by the act in question, we cannot assent to the proposition that he is by the act made the final expositor of legal questions which may arise. There is nothing indicating that such was the purpose of the legislature, and it would require an unmistakable declaration to warrant a construction leading to that conclusion. Ordinarily all lands are subject to taxation, and if the taxes have not been paid they are due to the State. There may be exceptional circumstances, in which nothing

would be due, as where the land was the site of a church, or of a cemetery, or of a charitable institution, in which cases the exemption would be determinable as a question of fact, or if, as in this case, it is claimed as exempt under the charter of a company, that is an exemption to be determined as a matter of law arising upon a construction of the charter. If, however, the auditor mistakes the law, and erroneously treats the property as exempt, and makes a conveyance of the State's title, such conveyance is of no avail, and neither defeats the title of the State nor confers title upon the grantee.

If the quit-claim deed was executed without payment of the taxes due to the State, it was without authority of law, for the act expressly declares that no conveyance shall be made unless such taxes are first paid.

The contention by the appellee that in no event can the appellants call in question the correctness of his decision is not maintainable. The appellants desire to purchase, and are entitled to purchase, the lands if still held by the State, and to the assertion that the State's title has been conveyed to another they may reply that the conveyance had no effect because made without authority of law, for it is only by securing the deed from the State that they can obtain a standing in the courts to *litigate* with the prior *grantor*. *State* v. *Meyers, ante.*

This brings us to the consideration of the question whether the land in the hands of the railroad company was subject to taxation. We pretermit any expression of opinion upon the question of the liability of the lands to taxation anterior to the year 1882, prior to which time they were held or claimed by the board of levee commissioners. In 1881 they were purchased by the railroad company, and after that became subject to taxation unless exempted therefrom under its charter. It is claimed that a fair construction of the charter of the company exempts not only its road-bed, stations, shops, and other real estate necessary or convenient to the purposes of the corporation, but also its outlying lands acquired by it for purposes of sale or for the benefit of the timber growing thereon; and it is further insisted that such construction has

been given to the charter by the legislative department of the State.

By the thirteenth section of its charter (Acts of 1870, page 324) it is provided that subscriptions to the stock of the company may be taken by the directors payable in land, to be valued as therein provided, and to this section there is also a proviso that " nothing in this act shall be construed to prevent the president and directors from receiving donation of free gifts of land to the company."

By an act of March 3, 1882 (Acts, page 1011), the Memphis and Vicksburg Railroad Company and the Mississippi Valley and Ship Island Railroad Company were permitted to consolidate, and became merged into the Louisville, New Orleans and Texas Railroad Company, and it was further provided " that the provisions of the twenty-first section of an act entitled, ' An Act to incorporate the Mobile and Northwestern Railroad Company,' approved July 20, 1870, is hereby made to apply to the said consolidated company, and for that purpose the said section is hereby. declared to be part of this act, and this act shall be construed as though the twenty-first section was specially set out herein."

The twenty-first section of the act incorporating the Mobile and Northwestern Company is as follows : " That, in consideration of the construction of the railroads provided for herein, and of the great benefit which the State will receive in the development of its agricultural resources by means of said railroads as works of internal improvement, and also of the increased value which will thereby be added to the property of the State, thus enabling the State to greatly increase its revenue without additional and burdensome taxation upon the people, the State hereby agrees with said company (and which agreement is irrepealable) that all taxes to which said company shall be subject for the period of thirty years are hereby appropriated and set apart, and shall be applied to the payment of the debts and liabilities which the said company may have incurred in the construction of said road, or for money borrowed by said company upon lands or otherwise, to be used in constructing said road, or paying debts incurred by said company in

constructing the same ; and it shall be the duty of the tax collector
in every county, in each and every year, to give to said company a
receipt in full for the amount of said taxes upon receiving from the
company an affidavit made by the president or cashier of said com-
pany that the amount of said taxes have actually been paid and
applied by said company, during the year, in payment of the debts
incurred, or money borrowed as aforesaid, and which receipt so
given shall be in full of all taxes, county, State, and municipal, to
which said company shall be subject.''

It is insisted that since by the charter the legislature permitted pay-
ment of stock to be made in lands and donations of land to be made
to the company, it must have contemplated that the company would
become the owner of such property, and that by devoting all taxes to
which the company should become liable to the payment of " money
borrowed on its lands" it evinced a purpose to release such lands from
taxation, for, it is argued, the legislature could not have intended
to relieve the lands from the burden of debt imposed upon them
by mortgages executed by the company, and then to put on them
the burden of taxation.   This suggestion is not without force, but
it is valuable only as an aid to the construction of the charter, and
the cardinal rule of construction still remains that grants or privi-
leges are to be strictly construed, and in cases of doubt are to be
resolved in favor of the State.   In other words, that where the
words of a grant are susceptible of two constructions, either of
which is reasonable and fairly to be drawn, the courts must assume
that the legislature acted with reference to the known rule and in-
tended only to grant those privileges or immunities implied in the
more restricted sense.   The exemption here is of taxes " to which
said *company* shall be subject," it is not of all taxes to which all or
any property owned by the company, whether necessary or conve-
nient to its business, or disconnected therefrom, may be subject.
The business of a railroad company, the property and instrumen-
talities ordinarily owned and employed by them, it must be assumed
were well known to the legislative department, and it must also be
assumed that the language employed was used in reference to such
business and property, unless a contrary intention is shown.   " All

taxes to which said company shall be subject " must, therefore, we think, be construed to include only the taxes due upon the property of the company necessary to the construction, equipment, maintenance, and operation of its road. Many of the authorities upon the question here involved are collected by Cooley on Taxation 146 to 153. From them we can deduce no principle of construction which would include in the exemption granted an exemption of the outlying lands owned by the company. The lands involved in this suit have no sort of connection with the business of the company; they are owned by it only as the same character of lands would be owned by a private individual, and for the same purposes; they were bought, not to enable the company to perform any duty it owes to the public, but that it might by dealing in them make a profit as a buyer and seller; in this character we find nothing in the words or spirit of the exemption clause giving immunity from taxation.

Reliance is placed by the appellee upon the fact that by the act of March 12, 1884 (Acts, page 29), the legislature, while declaring the liability of all detached lands owned by railroad companies to taxation (notwithstanding any exemption clause of its charters), expressly declared, " That the provisions of this act shall not have the effect to tax any of the lands of the Memphis and Vicksburg Railroad Company until the first day of February, 1886," and also upon the proviso to the second section of the act of March 14, hereinbefore set out, " That the Memphis and Vicksburg Railroad Company shall not be required by the auditor to pay any State and county taxes heretofore due from which it was exempted by the provisions of its charter, or of any act of the legislature passed prior to the year 1884."

If the act of March 12 be construed as exempting by its terms these lands, it could only be applied to taxes thereafter arising, for if it be said that this is a legislative construction of the charter that the lands were always exempt in the hands of the company, the obvious reply is that it is not for the legislature to construe laws for the past. That duty is by the constitution devolved upon the courts. The legislature may determine what the law shall be, but the courts must say what the law has been.

The act of March 14 by express terms excluded the auditor from considering any exemption except that conferred by the charter or by acts passed prior to the year 1884. Without determining whether any taxes were due to the State prior to the purchase of the lands in 1881 by the company, we are of opinion that they then became taxable, that the auditor had no warrant in law for executing the quit-claim under the act of March 14, 1884, without payment of the taxes due, and that the fact that he did make such conveyance affords no justification for his refusal to make the deed demanded by the petitioners.

*The judgment of the court below is, therefore, reversed, the demurrer overruled, and cause remanded.*

*W. P. & J. B. Harris,* of counsel for the appellee, filed a petition for a re-argument.

The opinion of the court below in response to the petition sufficiently states the points urged in support of the petition.

Cooper, C. J., delivered the opinion of the court in response to the petition for a re-argument asked by the appellee.

We have carefully considered the petition for a re-argument filed in this cause and the briefs by which it is supported, but remain satisfied of the correctness of our opinion heretofore delivered.

The appellants are not strangers or interlopers, as is suggested by counsel for the appellee, but are applicants to purchase the title held or claimed by the State, having a right under the general laws of the State to a conveyance of that title by the auditor upon payment of the sums tendered by them. The duty of the auditor is a purely ministerial one—to convey such title as the State may have upon the payment of the taxes charged against the land, and it is for a failure to perform this duty that they invoke the power of the court. The petitioners do not come claiming to be the owners of the lands; their claim is that they are entitled to acquire by purchase whatever title the State has, and that this right is refused them by the appellee. As to this right, the only one claimed by them, the petitioners are certainly not strangers, and the fact that in justification of his refusal to recognize it the auditor

relies upon the title of the railroad company does not preclude them from showing that this asserted title ought not to be successfully interposed against them. It is only because it is necessary for the determination of the rights of the parties to the record that we have passed upon the validity of the title thus invoked. Our decision does not bind the company whose title is interposed in bar of the petitioners' rights, we only say that on facts stated in the record such title is invalid. It may be that the facts now admitted are not true, and the railroad company may in a contest to which it is a party show other and different facts from which other and different conclusions would follow. If, in a controversy between A and B, the court should declare that an unsealed deed was sufficient to convey title, or that a certain judicial sale on the facts appearing in the controversy between A and B was invalid, it could hardly be argued that injustice had been done to C, who also held an unsealed deed, or who had bought at the judicial sale condemned by the court.

The suggestion that the State alone can question the validity of the conveyance, made by the auditor to the company under the act of 1884, would avail if the act of the auditor was the act of the State. But it is because his act was not the act of the State that we have repudiated the suggestion. The conveyance, as we have said, was not only made without authority of the State, but was made in violation of an express prohibition—in the very statute which confers the power under which the auditor professed to act. There has been, then, no act consented to or authorized by the State, and to give any effect whatever to the conveyances made would be to convert a void deed into one voidable at the election of the State, but effectual, until repudiated, to convey title. The payment of all taxes due the State was by the act of 1884 made a condition precedent to a conveyance by the auditor. Where confessedly such condition was not complied with, we know of no rule of law which would give to the auditor's deed any effect, either as against the State in a proceeding instituted by it to annul the conveyance or as against one seeking to acquire the State's title under a right conferred by general laws.

We cannot assume that the auditor, acting under the advice of the attorney general, has stricken the lands in controversy from the rolls in his office, as it is provided by § 569 of the code he may do when the State, from any reason, has failed to acquire title at a sale for taxes. In the first place, the petition charges that the lands were conveyed by the auditor to the railroad company, and from this it would be more reasonable to infer that they then stood on the State's rolls. The petition also states that since the sale of 1862 the lands have been continuously claimed by the State, meaning, we suppose, except as conveyed by the auditor under the act of 1884. If these facts did not appear in the record, the presumption that they were stricken from the rolls could only follow an examination and condemnation of the title claimed by the State, and this, as we have held, and we think correctly, is not a proper subject for investigation in an action of mandamus.

We have carefully reconsidered the proposition advanced in the original argument of the cause, and now repeated and urged upon us with great earnestness and ability, that even in an action of mandamus the court ought to so far investigate the question of title as to refuse the writ where it appears from the petition that the State is without title, and that its failure to acquire title arose from the fact that the lands in controversy were at the time of the sale for taxes of a class that were exempt from taxation ; and it is very forcibly argued that in such case we do not determine a question of title, but only that as to such lands there can be no controversy about title for the reason that it was always impossible for the State to deal with the lands under its revenue laws. The reply to this is, we think, that the lands in controversy were not originally of a class not subject to taxation, and whether they have been assigned to that class by anything set up in the petition depends upon the solution of questions which are questions of title or no title in the State or levee board. The lands were once the subject of private ownership and as such liable to taxation. They were taxed, and were in default and were sold for taxes and bought by the State. Subsequently the levee board, claiming that this sale to the State was invalid, caused them

to be again sold, and it became . the purchaser. They were again sold by the State in 1875. It will thus be seen that before we can declare that these lands belonged to a class not subject to taxation we must first decide that the sale of 1862 was void, and that the subsequent sale to the levee board was valid. To do this we would be manifestly passing upon questions of title, and we are satisfied that this should not be done in this proceeding further than is necessary for the determination of the question involved, which is simply, whether the auditor, a merely ministerial officer, has refused to recognize a right in the appellants conferred upon them by the general law, and has refused to perform a duty imposed upon him by law, and in the performance of which the appellants are interested. As we have said, the appellants' right is to buy whatever claim the State has ; it is this right they seek to enforce and which has been denied them, and it is this right, and this only, that they ask the court to enforce. In the determination of the question thus presented it is unnecessary, and, we think, improper, to extend the examination so as to include the decision of conflicting claims of title.

*We dispose of the case only as presented by the demurrer, and remand it for further proceedings in the court below.*